UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **IFONE NEDA INTERNET SERVICE, INC.,** *et al*, § § § Plaintiffs, § VS. § **ARMY & AIR FORCE EXCHANGE SERVICE,** *et al*, § § § § Defendants. § | CIVIL ACTION NO. 4:21-CV-330 |

## MEMORANDUM AND OPINION

Plaintiffs filed this case on February 1, 2021 and moved for preliminary injunctive relief. (Docs. 1, 19, 21, 27.) On February 26, 2021, this Court held an evidentiary hearing, and on March 1, 2021, this Court held a follow-up hearing. After considering the written briefing, evidence presented, oral arguments, and relevant law, the Court concluded that preliminary injunctive relief should be **DENIED**. The Court entered an order to that effect on March 1, 2021. (Doc. 32.) The Court writes to further set out the reasons for its denial in light of Plaintiffs' Motion for Reconsideration (Doc. 33.)

**I.      BACKGROUND**

This case arises amidst the United States government's recent decision to decrease its military presence in Afghanistan. (Doc. 25, Exhibit A ¶ 5.) As a result of that decision, the size of the U.S. military base at Kandahar Airfield (KAF), also known as New Camp Brown (NCB), has commensurately shrunk. (Doc. 25, Exhibit D ¶ 3.) The Commander of that base, Lieutenant Colonel Adamcyzk, is responsible for planning for the reduction in the base's physical footprint, including related infrastructural changes. (Doc. 25, Exhibit A ¶ 5.) The Acting Mayor of the base, Jacob Horn, is responsible for coordinating day-to-day operations within KAF and carrying out

1

Commander Adamczyk's policies. (Doc. 25, Exhibit D ¶ 2.)

Plaintiffs IFONE NEDA Internet Service, Inc. and IFONE, Inc. (together, "IFONE") have provided internet services at KAF since at least 2013. (Doc. 21 ¶ 13.) IFONE is one of two contractors that has provided internet services at KAF, the other being DHI Telecom, LLC. (Doc. 25, Exhibit B ¶ 6.) IFONE initially provided services pursuant to an April 12, 2013 agreement with Colonel Mitchell Malone, then-U.S. Commander at KAF, which authorized IFONE to access the base (Doc. 1-2 at 27–34) and a subsequent contract between IFONE and the Army and Air Force Exchange Services (AAFES). (Doc. 25, Exhibit B1.) IFONE additionally has subcontracts with at least 10 other DOD and NATO civilian and military organizations under separate service agreement contracts. (Doc. 15-2 at 6.)

The agreement with AAFES is a "non-exclusive contract to provide Internet Service Provider (ISP) concession operations in Afghanistan." It states that IFONE "will offer internet access to individual living quarters 'in-room', Wi-Fi hotspots, and any locations designated by the Exchange." (Doc. 25-2 at 25.) Its "Termination" clause allows the contract to be terminated by either party immediately upon thirty days written notice. (Doc. 25-2 at 33.) Its "Disputes" clause states: "All disputes arising under or relating to this contract shall be resolved under this clause." (Doc. 25-2 at 35.) Under that clause, a contractor must submit claims to the contracting officer for a written decision, which may be appealed to the Armed Services Board of Contract Appeals (ASBCA). (*Id.*)

On January 5, 2021, KAF/NCB Command made an initial decision to retain IFONE, not DHI, as the sole internet service provider on base in light of the drawdown. (Doc. 25-2 at 184.) Following discussions on January 21, however, Kristin Mazur (the Camp Mayor at KAF) and Daniel Roney (the Senior Enlisted Leader on NCB) reversed course and decided to retain DHI

2

instead of IFONE. (Doc. 25-2 at 186–188.) The reasons given were that "[DHI's] towers and equipment are already within the NCB footprint," whereas IFONE had physical infrastructure outside the boundaries of NCB that would be more difficult to move. (*Id.*)

On January 24, IFONE's co-CEO Joseph Stewart responded to the decision by explaining that IFONE would be able to relocate inside the new perimeter within 30 to 45 days with "minimal to no downtime" of existing services. (Doc. 1-2 at 20.) As IFONE is a "joint venture United States and Afghan company," that relocation process would have involved negotiating land rights outside the new perimeter directly with the Afghan National Army ("ANA") contingent. (*Id.* at 19.) Roney felt that IFONE's proposal was "not a viable option" for three reasons: (1) the ANA does not actually own the land outside the perimeter where IFONE was stationed, so IFONE lacked a basis to negotiate authorization to stay in that area, (2) as a result, IFONE's workers would be unable to enter NCB for basic necessities such as dining or living, and (3) IFONE would not have a way of obtaining fuel for generators for its Network Operations Center (NOC) that were not tied to force protection outside the perimeter. (*Id.* at 18.) In subsequent e-mail exchanges, IFONE reiterated that it would need 45 days to engineer and install a new NOC inside NCB, which Roney reiterated would be too long; IFONE subsequently expressed a willingness to meet any "viable timeline" given to it by Camp Command. (*Id.* at 13–15.) After further back and forth between KAF/NCB Command and IFONE, on January 25, Mazur directed Stewart to seek any further guidance from his "COR" (Contracting Officer Representative). (*Id.* at 9.)

On January 26, 2021, Contracting Officer James Gordon, in a written letter, told IFONE that the government was terminating its contract with IFONE (including services provisioned through subcontract support) effective February 28, 2021. (*Id.* at 6.) It directed IFONE to pay all fees to AAFES, return all AAFES-owned property, surrender installation passes to the installation

3

Provost Officer, and provide a draw down plan and exit strategy. (*Id.*) The stated reason for the decision was that "the location of IFONE's current NOC is outside the new boundaries of KAF/NCB, and because of the probable time difference between those boundaries going up and IFONE's replacement NOC going into operation." (*Id.* at 8.)

On February 5, Acting Mayor of NCB Jacob Horn informed IFONE that it would be allowed to store its physical infrastructure within the NCB, which led to a misunderstanding. IFONE understood this to reinstate its ISP contract. (Doc. 21 ¶ 24.) However, Horn subsequently clarified that, as he is not a contracting officer, he has no authority to modify contracts and did not mean to do so. (Doc. 25-4 at 3.) In any event, on February 9, 2021, Lieutenant Commander Adamczyk wrote to Contracting Officer Gordon stating that IFONE's services were no longer needed and requesting that IFONE stop all services no later than March 1 and for their demobilization to begin immediately thereafter, including the removal of unutilized equipment and resources before March 13, 2021. (Doc. 25-2 at 214.)

In its Amended Complaint and Motion for a Preliminary Injunction, IFONE seeks relief via two causes of action. First, IFONE alleges that the decision to terminate its AAFES contract and, by extension, its subcontracts, violated its due process rights under the Fifth Amendment as an unlawful *de facto* debarment. (Doc. 21 ¶¶ 35–37.) Second, IFONE alleges that the decision violates the Administrative Procedure Act (APA). (Doc. 21 ¶¶ 38–45.)

## II. JURISDICTION AND JUSTICIABILITY

28 U.S.C. § 1331 grants federal district courts jurisdiction to hear claims challenging agency action under the APA, 5 U.S.C. § 702, including where a plaintiff challenges a military contracting decision. *See Blackhawk Indus. Prods. Grp. Unlimited, LLC v. United States Gen. Servs. Admin.*, 348 F. Supp. 2d 662, 666 (E.D. Va. 2004). After the Court has established its

4

jurisdiction to hear the case, it must nevertheless additionally decide whether a judicial remedy is available. *See, e.g.*, *Adkins v. United States*, 68 F.3d 1317, 1322 (Fed. Cir. 1995) ("Even where a court possesses jurisdiction to hear a claim, it may not do so in cases where the claim presents a nonjusticiable controversy—i.e., the claim is such that the court lacks ability to supply relief."). "[J]usticiability is a particularly apt inquiry when one seeks review of military activities." *Id.* (quoting *Murphy v. United States*, 993 F.2d 871, 872 (Fed. Cir. 1993)). At the same time, "[n]ot every claim arising from a military decision presents a nonjusticiable controversy." *Adkins*, 68 F.3d at 1323. For example, even where the "*merits* of a decision committed wholly to the discretion of the military are not subject to judicial review, a challenge to the particular procedure followed in rendering a military decision may present a justiciable controversy." *Id.* (emphasis in original) (collecting cases); *see also Murphy*, 993 F.2d at 872 ("A court may appropriately decide whether the military followed procedures because by their nature the procedures limit the military's discretion); *Mindes v. Seaman*, 453 F.2d 197, 199 (5th Cir. 1971), *rev'd on other grounds on appeal after remand*, 501 F.2d 175 (5th Cir. 1974) ("Whether the Post Commander acts arbitrarily or capriciously, without proper justification, is a question which the courts are always open to decide.").

Similarly, the APA exempts from judicial review agency action taken by a "military authority exercised in the field in time of war or in occupied territory." 5 U.S.C. § 701(b)(1)(G). The D.C. Circuit has explained this exception as one applying to "military commands made in combat zones or in preparation for, or in the aftermath of, battle." *Doe v. Sullivan*, 938 F.2d 1370, 1380 (D.C. Cir. 1991). The court elaborated that the exception would preclude, for example, "judicial interference with the relationship between soldiers and their military superiors." *Id.* In finding that the exception did not apply, the D.C. Circuit stated that it was "confront[ed with] . . .

5

not a dispute over military strategy or discipline, not one between soldiers and their superiors, but one over the scope of the authority Congress has entrusted to the FDA." *Id.* In other words, the exception does not apply to all "military matters" generally, but rather to those that implicate military authority in a particular way—usually involving the exigencies of battle. *Id.* at 1381; *accord Nattah v. Bush*, 770 F. Supp. 193, 202–03 (D.D.C. 2011) ("While the military is not exempt as a whole from all wartime activities unrelated to armed conflict, . . . the exception reflects a policy determination that acts undertaken by, or at the direction of, military officers or commanders in a time of war must be exempt from judicial review to avoid the debilitating effect the specter of judicial scrutiny might have in combat situations."). "Whether a particular act is subject to this exception is a fact-intensive inquiry." *Nattah*, 770 F. Supp. at 203 (citing *Rosner v. United States*, 2002 WL 31954453, at *3 (S.D. Fla. Nov. 26, 2002)).

The decisions being challenged here are undoubtedly being exercised "in the field in time of war," but whether those decisions were made by military authority is more complicated. As *Doe v. Sullivan* and the other cases make clear, courts generally apply this exception to decisions between military officers or commanders and soldiers, or to decisions that otherwise implicate the "exigencies" of armed conflict. In contrast, this case stems from a decision made by a government contracting officer, even though that decision was made at the request of military authority and for military reasons. Still, the decision to terminate a contract with a long-time internet service provider on base is more akin to the situation in a case such as *Diebold v. United States*, 947 F.2d 787, 789 (6th Cir. 1991), involving a contractor for base services (which the Sixth Circuit found to present a reviewable question) than the one in *Nattah v. Bush*, which involved a lawsuit by a military contractor alleging that he was forced to work by military officers as an interpreter and soldier in Iraq against his will (presenting a non-reviewable issue). While the decision to terminate

6

the contract was requested by a military commander—Lt. Col. Adamczyk—that decision was not made to soldiers or otherwise made "in preparation for, or in the aftermath of, battle." The current dispute centers in part around the order for IFONE to move all of its infrastructure off base, and the existence of that infrastructure does not appear to pose a military exigency of the kind that would render AAFES's decision here outside the scope of judicial review guaranteed by the APA, even if it presents military-related logistical issues. Thus, the decision is judicially reviewable.

The Court, having found that it has jurisdiction and that the claims are justiciable, now terms to the claims for preliminary injunctive relief.

### III. PRELIMINARY INJUNCTION

At bottom, IFONE seeks an order enjoining the government from retracting IFONE's permit to operate inside the perimeter at KAF/NCB. A preliminary injunction is an "extraordinary remedy." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). IFONE bears the burden of showing: (1) a substantial likelihood of success on the merits, (2) irreparable harm in the absence of relief, (3) that the balance of equities favors them, and (4) that an injunction is in the public interest. *Id.* at 20; *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987).

#### A. Substantial Likelihood of Success on the Merits

IFONE seeks relief pursuant to two claims: (1) *de facto* debarment, and (2) violation of the APA. The Court addresses the likelihood of success on the merits as to each claim in turn.

##### i. *De Facto* Debarment

Debarment is a policy tool that is used by the government to ensure that it contracts only with "responsible" contractors. 48 CFR 9.402 ("Agencies shall solicit offers from, award contracts to, and consent to subcontracts with responsible contractors only. Debarment and suspension are discretionary actions that . . . effectuate this policy."). Federal regulations define the effects of

7

debarment as follows:

> Contractors debarred, suspended, or proposed for debarment are excluded from receiving contracts, and agencies shall not solicit offers from, award contracts to, or consent to subcontracts with these contractors, unless the agency head determines that there is a compelling reason for such action. Contractors debarred, suspended, or proposed for debarment are also excluded from conducting business with the Government as agents or representatives of other contractors.

48 CFR 9.405. As this language makes clear, debarment carries serious consequences. In effect, it is an "an administrative action which excludes nonresponsible contractors from government contracting." *Caiola v. Carroll*, 851 F.2d 395, 397 (D.C. Cir. 1988). As a general matter, debarment must occur pursuant to formal proceedings and is taken by a "debarring official." *See Burke v. EPA*, 127 F. Supp. 2d 235, 238–39 (D.D.C. 2001) ("The initiation of a debarment proceeding requires the existence of past misconduct. . . . [T]he debarring official must determine whether any mitigating factors show that the business risk to the government has been eliminated to the extent that debarment would be unnecessary.").

There is no allegation in this case that IFONE has been formally debarred, as the government did not follow any of the numerous procedures required by regulation had it done so. Nevertheless, in the absence of formal proceedings, a party may allege that a *de facto* debarment has occurred, "when a contractor or subcontract has, for all practical purposes, been *suspended or blacklisted* from working with a government agency without due process, namely, adequate notice and a meaningful hearing." *Phillips v. Spencer*, 390 F. Supp. 3d 136, 155 (D.D.C. 2019) (emphasis added). Because the consequences of *de facto* debarment are so severe, when it occurs "without due process and on grounds of dishonesty, fraud or lack of integrity, [it] violates the Fifth Amendment." *Id.* at 161. At the same time, "[t]he standard for proving *de facto* debarment is high." *Id.* at 155.

"Two options exist to establish a *de facto* debarment claim: 1) by an agency's statement that it will not award the contractor future contracts; or 2) by an agency's conduct demonstrating that it will not award the contractor future contracts." *Phillips v. Mabus*, 894 F. Supp. 2d 71, 81 (D.D.C. 2012) (quoting *TLT Const. Corp. v. United States*, 50 Fed. Cl. 212, 215–16 (Fed. Cl. 2001); *see also Spencer*, 390 F. Supp. 3d at 155 (describing *de facto* debarment as "a systematic effort by the procuring agency to reject *all* of the bidder's contract bids"). To show that an agency's conduct amounts to debarment, a plaintiff "[does] not have to prove that it [has] lost 100% of its work," but only "that the government's actions were aimed at the overall status of the plaintiff as a contractor, specifically at plaintiff receiving *new* contracts." *Mabus*, 894 F. Supp. 2d at 82 (emphasis added). In other words, "*de facto* debarment may lie where there has been exclusion from virtually all government work for a fixed period of time, . . . or where the government's conduct has the broad effect of largely precluding plaintiffs from pursuing government work." *Id.* (internal modifications and citations omitted).

The reasons that *de facto* debarment implicates constitutionally protected liberty interests are articulated at length in the foundational D.C. Circuit case *Old Dominion Dairy Products, Inc. v. Secretary of Defense*, a case on which IFONE heavily relies. 631 F.2d 953 (D.C. Cir. 1980). There, the government's contracting officer made a determination that the plaintiff "lacked integrity." *Id.* at 955. As a result, the plaintiff was rejected for two substantial government contracts despite submitting the low bid each time. *Id.* The plaintiff "never received any notice of the charges against it," and was in turn "never afforded the slightest opportunity to respond to those charges." 631 F.2d at 964. In holding that the government's actions implicated a constitutionally protected liberty interest, the court emphasized that Old Dominion's reputation had been impugned: "Old Dominion was denied the renewal of the . . . contract solely on the basis of Sergeant Trevino's

determination that Old Dominion 'lacked integrity. As stated in *Roth*, 'where a person's good name, reputation, honor, or integrity is at stake because of what the Government is doing to him, notice and an opportunity to be heard are essential.'" *Id.* at 963 (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 573 (1972)). In *Roth*, the Supreme Court rejected a due process claim where a public university "did not base the nonrenewal of [an instructor's] contract on a charge, for example, that he had been guilty of dishonesty, or immorality," but noted that it would be a "different case" had such an accusation been present. 408 U.S. at 573.

Later cases echo this rationale. *See, e.g.*, *Mabus*, 894 F. Supp. 2d at 83 ("As this Circuit has held, individuals and corporations have a due process liberty interest in avoiding the damage to their reputation and business caused by the stigma of broad preclusion from government contracting."); *Spencer*, 390 F. Supp. 3d at 161 ("The D.C. Circuit has recognized that de facto debarment of a government contractor without due process and on grounds of dishonesty, fraud or lack of integrity violates the Fifth Amendment."). In *Mabus*, the district court found that the plaintiffs alleged that the government "decided to bar them from Navy work because of rumors that plaintiffs were submitting fraudulent bills to the government" and because of their "lack of transparency." 894 F. Supp. 2d at 83. Similarly, in *Kartseva v. Department of State*, an employee of a government contractor was declared "ineligible to work on [a State Department] contract" due to "counterintelligence concerns" which were never explained to her and to which she never had an opportunity to respond. 37 F.3d 1524, 1525 (D.C. Cir. 1994). There, the court grappled with the issue of whether these counterintelligence concerns, without more, were "sufficiently stigmatic to work a similar disqualification" for other jobs. *Id.* at 1530. The court remanded the case to the district court to resolve whether those concerns effected a broad preclusion of Kartseva's ability to work for the federal government. *Id.* And in *Leslie & Elliott Co., Inc. v. Garrett*, crucial to the

10

district court's finding of *de facto* debarment was not the fact that contracts had been denied to plaintiff *per se*, but that the contracting officer had determined that the plaintiff had "demonstrated a *persistent* pattern of bidding jobs low and *exploiting* obscure flaws in the plans and/or specifications to the detriment of the Navy and the taxpayer"—a clearly stigmatizing sentiment. 732 F. Supp. 191, 197 (D.D.C. 1990) (emphasis in original).

Based on this caselaw and on the factual record currently before the Court, IFONE has failed to prove a substantial likelihood of success on the merits as to its *de facto* debarment claim. First, IFONE has failed to meet either of the tests outlined in *Mabus*: that the government has made clear, either through its statements or conduct, that it will not award IFONE future contracts. To find otherwise would require the Court to infer, based on the government's termination of the AAFES contract and associated subcontracts alone, that the government was prohibiting IFONE from all or virtually all future government work. The Court is unable to make that inference at this early stage of the litigation, without knowing, for example, if a bid by IFONE was rejected by the government following this termination decision. *See, e.g.*, *Dynamic Aviation v. Dep't of Interior*, 898 F. Supp. 11, 13 (D.D.C. 1995) ("The government points to the fact that plaintiff has not bid on any formal contract since the date his suspension was lifted, . . . and argues correctly that *de facto* debarment has generally been found only where the party claiming debarment bid on and was denied more than one contract.").

More fundamentally, the lack of any allegation or evidence that the government's decision was based on charges of IFONE lacking integrity, or perpetrating fraud, or being generally nonresponsible, is particularly telling. As the cases make clear, such evidence, while perhaps not strictly *necessary*, is at the very least highly probative in implicating a constitutionally protected liberty interest. In fact, the stated reason for the government terminating its contract with IFONE

11

is much simpler—that IFONE's competitor was located entirely within the new perimeter of KAF/NCB, whereas IFONE was not. Based on the record currently before the Court, this was not, as IFONE insists, a *post hoc* justification, but rather was explained in e-mails between members of the military command in mid-January, before the decision was communicated to IFONE. Finally, in each of the *de facto* debarment cases cited by IFONE, beginning with *Old Dominion*, the contractor had essentially no awareness of the reasons for the government's decision not to contract. In this case, the government made clear its rationale to IFONE. While IFONE of course disputes this rationale, the fact that IFONE is aware of the basis for the government's decision distinguishes this case from the line of *de facto* debarment cases discussed above.

In sum, without evidence either that the decision to terminate IFONE's AAFES contract and related subcontracts in some way affects IFONE's ability to contract with the government in the future, or that the decision was based in whole or in part on an accusation of nonresponsibility a lack of integrity, or impropriety, the Court cannot conclude—under the high standard required for preliminary injunctive relief—that IFONE has a substantial likelihood of proving a *de facto* debarment claim.[1]

---

[1] In its Motion for Reconsideration, IFONE protests that the Court has created an impossibly high standard for proving *de facto* debarment. The Court disagrees. The cases make clear that the standard for proving *de facto* debarment is high, and with good reason—such a claim converts what would otherwise be ordinary contracting cases into ones with serious constitutional implications. Just as the Supreme Court found in *Ross*, this case would be a different one had the government accused IFONE of impropriety or fraud, or had engaged in a systematic pattern of rejecting IFONE's bids for future government contracting awards. The Court is well aware that the allegations in this case raise serious business concerns for IFONE, and the Court does not detract from the weight of those concerns. But simply put, the Court is unable to make the inferences that would be required to turn these business concerns—weighty as they are—into constitutional ones. The Court also reiterates that IFONE may be able to show *de facto* debarment with the benefit of more evidence after discovery, but the standard for preliminary injunctive relief is high.

### ii. Administrative Procedure Act

Judicial review under the APA is limited to final agency action. 5 U.S.C. § 704. In its Motion for Reconsideration, IFONE argues that the decision in this case was final and thus reviewable because *de facto* debarment constitutes final agency action, and because the government has offered them no means to exhaust administrative remedies. (Doc. 33 at 11.) As to the first argument, the Court has found that IFONE has, based on the current record, failed to establish a likelihood of success on its *de facto* debarment claim, and therefore that claim does not itself provide a basis for finding reviewable final agency action here. As to IFONE's second argument, the Court notes that the AAFES contract contains a process for resolving disputes, which involves first filing a claim with the contracting officer, which may be subsequently appealed to the Armed Services Board of Contract Appeals. As IFONE has not engaged that process at all, it has not, on the current record, exhausted its administrative remedies.

The Court additionally recognizes that IFONE bases its APA claim at least in part on the argument that it is authorized to operate at KAF/NCB independent of its AAFES contract. While a deeper factual record may help elucidate this issue, the Court finds that the language in the AAFES contract belies this interpretation of the prior 2013 settlement agreement purportedly giving IFONE this authorization. The contract contains a clause that anticipates rapid changes in the military environment which may affect IFONE's investments:

> The contractor understands and agrees that all business risk remains with the contractor. Business risk includes, but is not limited to, contractor's investment in equipment and supplies, permit and license fees, employee wages, and lost sales and income resulting from all operational changes or contract termination. The military sites envisioned under this contract are part of military operations. As such, the military will make appropriate decisions in the prosecution of the military operations with limited or no consideration of contract activities. Military decisions about the necessity, location, and duration of any services may change over time and are not controlled by the Exchange. It is expressly understood and agreed that neither the Exchange nor any other agency or instrumentality of the United States is or will be liable to concessionaire for costs of concessionaire's

investment in equipment and infrastructure for this contract.

(Doc. 25-2 at 122.) Thus, IFONE was aware of the business risk it assumed in entering the AAFES contract—in particular, the risk that military decisions may be made with little to no regard to contracting implications.

Finally, the Court cannot find on the current record that the military's request to continue DHI's services but not IFONE's services, when continuing IFONE's services would necessitate additional logistical work on a military base, was likely arbitrary or capricious. The government's stated reason for terminating its contract with IFONE, including the requirement that IFONE evacuate the base in light of the fact that the military determined it needed only one internet service provider, was plausibly justified by the goals of the current troop drawdown in Afghanistan broadly and KAF/NCB specifically. While the Court does not believe that the APA's military authority exception to judicial review fully applies in this circumstance, there is also no doubt that the Court must "defer[] to the professional judgment of military authorities concerning the relative importance of a particular military interest." *Winter*, 555 U.S. at 24. This Court ultimately cannot pass judgment on whether the decision to continue the DHI contract at the expense of the IFONE contract was a correct or prudent one; the Court does find, however, that the decision was made at the behest of a bona fide request from military authorities.

Having found that IFONE has not established a substantial likelihood of success on the merits as to either its Fifth Amendment *de facto* debarment claim or its APA claim, the Court need not proceed to the other prongs of the preliminary injunction analysis.

## IV.    CONCLUSION

For these reasons, the Court finds that preliminary injunctive relief is unwarranted at this time, and Plaintiffs' Motion for Reconsideration (Doc. 33) is **DENIED.**

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on March 25, 2021.

_____
HON. KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE